IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| A.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-00351-SRB |
| | ) | |
| WILLIAM JEWELL COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant William Jewell College's ("WJC") Motion for Summary
Judgment (Doc. #118). On January 19, 2021, this Court held oral argument on the motion. For
the reasons stated below, WJC's Motion for Summary Judgment is GRANTED, in that Plaintiff
A.P.'s ("A.P.") Title XI claims (Counts I, II, and III) are dismissed with prejudice. As for A.P.'s
state law claims (Counts IV-Count VIII), the Court declines to exercise supplemental jurisdiction
and accordingly dismisses without prejudice the remaining state law claims.

## I.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) requires a court to grant a motion for summary
judgment if 1) the moving party "shows that there is no genuine dispute as to any material fact"
and 2) the moving party is "entitled to judgment as a matter of law." Material facts are those
"that might affect the outcome of the suit under the governing law," and a genuine dispute over a
material fact is one "such that a reasonable jury could return a verdict for the nonmoving party."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When determining whether a motion
for summary judgment should be granted, a court "must consider the evidence in the light most
favorable to the nonmoving party and give him the benefit of all reasonable inferences in the
record." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008). "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042–43 (8th Cir. 2011). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.*

## II.    BACKGROUND[1]

This case arises from A.P.'s alleged rape by a fellow student, Z.P., while both were first-year students at WJC in the fall of 2017. Considering the facts in the light most favorable to A.P., and that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," the Court finds the relevant facts are as follows. *Anderson*, 477 U.S. at 248.

### A.  Events Occurring Prior to Z.P.'s Admission to WJC

WJC is a private liberal arts college located in Liberty, Missouri. On December 15, 2016, Z.P. submitted his online application for admission into WJC's freshman class for the 2017-2018 academic year and later signed a letter of intent to play football for the college. A few days prior, on December 6, 2016, WJC received a copy of Z.P.'s high school transcript as of November 30, 2016, which reflected no disciplinary issues. In response to the application's question, "Have you received school disciplinary action since the 9th grade?" Z.P. answered "yes," followed by the explanation that he had a "Misunderstanding with a Teacher." (Doc. #133, p. 6.) No additional description of the incident was provided, nor does the record show that the misunderstanding was sexually harassing in nature or that WJC conducted any follow-

---

[1] Unless stated otherwise, the Court finds that there is no genuine dispute as to the facts.

up.  After receiving two positive letters of recommendation from teachers, WJC admitted Z.P. as a student for the 2017-2018 academic year on February 2, 2017.[2]

### B.  Events Occurring After Z.P.'s Admission to WJC

#### 1.  The Video-Recording Incident

Z.P. arrived on campus sometime during the summer of 2017.  Early in the fall semester on the evening of September 3, 2017, two students, A.J. and E.W., engaged in consensual sexual intercourse in E.W.'s dorm room which was located on the ground floor of the co-ed dormitory Browning Hall.  Because it was dark outside and the room lights were on, and the blinds did not completely block their view, a group of approximately six students stood on the sidewalk outside and were able to observe A.J. and E.W. having sex.  Z.P., one of the students standing outside, used his phone to video-record the event and sent the video to E.W. (the male in the sexual encounter), who was his friend.  After E.W. received the video, he and A.J. promptly ended their encounter.  Later that evening, Z.P. shared the video with some football teammates and showed the video to several students and resident assistants ("RA") in the Eaton Hall dormitory, including RA D.S.  At some point that same evening, D.S. exchanged text messages with another

---

[2] Although the record includes facts regarding Z.P.'s disciplinary history in middle school and high school, A.P. concedes that WJC did not have actual knowledge of: (1) Z.P. choking a female in middle school, (2) having sex with a female on high school grounds, or (3) taking part in popping tires on a vehicle after being transferred to an alternative school setting to complete his high school academics.  (Doc. #133, p. 51.)  "[A] plaintiff must show that the school had actual knowledge that the assailant posed a substantial risk of sufficiently severe harm to students based on the assailant's previous known conduct."  *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1058 (8th Cir. 2017).  Actual knowledge is not satisfied by the "should have known" negligence standard.  *See Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999) (declining to impose liability under what amounted to a negligence standard—holding the district liable for its failure to react to teacher-student harassment of which it knew or should have known.  Rather, the Court found liability for damages only where the school itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge.).  While these facts may be relevant to A.P.'s negligence claims, this Court's holding on the Title IX claims removes federal question jurisdiction and, as discussed *infra* Section III.D, the Court declines to exercise its supplemental jurisdiction over the remaining negligence claims.  The recitation of facts related to incidents which WJC had no knowledge of are therefore unnecessary for this Order.

RA, M.D., asking M.D. to hurry and come help her because "[Z.P. wa]s really bothering [her]." (Doc. #133, p. 38; Doc. #133-12, p. 11.)

Dr. Andy Pratt ("Dr. Pratt"), WJC's Title IX Coordinator, was notified of the video-recording incident on September 11, 2017, at least six complete days after two RAs knew of the disturbing recording, and began an investigation in accordance with Phase I of WJC's Anti-Harassment Policy and Complaint Resolution Procedures. Neither A.J. nor E.W. wanted WJC to investigate the matter. WJC chose not to temporarily suspend Z.P. during the ongoing investigation because neither A.J. nor E.W. requested such measures and Dr. Pratt did not believe Z.P. was a violent threat. Between September 11 and 21, Dr. Pratt and other WJC employees collected witness statements and conducted interviews with students, including C.Y. and D.S.[3]

### 2. WJC Investigation into Video-Recording Incident: Student Interviews

#### a. C.Y.'s Interview

Pursuant to WJC's investigation into the video-recording incident, Dr. Pratt conducted an interview with C.Y on September 19, 2017. During C.Y.'s interview, C.Y. described Z.P. as a "predator" who "pushes hard to have sex with women." (Doc. #133, p. 16.) C.Y. recalled personally observing three interactions Z.P. had with women, only one of which could be construed as sexual harassment.[4] Although the parties dispute the surrounding events of this

---

[3] On September 19, 2017, WJC interviewed student B.S. who informed WJC that Z.P. previously had sex with a girl he "barely knew" after a fraternity party. (Doc. #133-7, p. 8.) This fact appears related to C.Y.'s testimony that Z.P. was grinding with a girl (E.P.) at a party, which seemed "consensual at the time," and C.Y. later heard Z.P. and the girl had sex afterwards. (Doc. #133-3, p. 16.) When asked during his deposition if C.Y. would be surprised to learn the sexual encounter between Z.P. and E.P. was not consensual, C.Y. responded, "I wouldn't be surprised at all." (Doc. #133-3, p. 13.) However, when WJC met with E.P. on October 5, 2017 and asked if she had been hurt by or had any negative interactions with Z.P., E.P. responded that she had not. (Doc. #118, p. 22.) If E.P. did in fact have sexual intercourse with Z.P., E.P. had personal knowledge of whether the encounter was consensual and C.Y. did not, therefore A.P. has not created a factual dispute on this issue.

[4] In addition to the encounter detailed above with T.R., C.Y. recalled seeing (1) Z.P. and E.P. "grinding on each other," which "did seem consensual," and (2) Z.P. working out with female B.F. in the WJC gym. (Doc. #133, pp. 17–18.)

interaction, both agree C.Y. was at a party with others in a room when Z.P. "got on [T.R.'s] bed" and attempted to persuade T.R., a female student, to sit on her bed with him. (Doc. #133, p. 18; Doc. #188-4, p. 12.) In his deposition, C.Y. recalled that, "[Z.P.] kept trying to hook up with [T.R.] like the whole night. And then like once people started leaving, he kept staying and he kept—like he was on her bed trying to touch her, trying to just like—he was obvious he wanted to stay there and stay with her after everyone left. And so I stayed. . . I asked [T.R.] if she wanted me to stay over, she said yes. They wanted me to stay so that I could get him out." (Doc. #133-3, pp. 2–3.)

### b. D.S.'s Interview

WJC officials additionally conducted an interview with D.S., the Eaton Hall RA on-duty the night of the video-recording incident. During her interview, D.S. informed WJC that Z.P. had considered transferring schools because "[t]here's not too many to pick from," referring to the number of women on campus.[5] (Doc. #133, p. 38.) Sometime after Z.P. made this comment, which D.S. found offensive, Z.P. asked D.S. to go to lunch. D.S. perceived this invitation to be a date and replied to Z.P. that "they could go sometime as friends." (Doc. #133-4, p. 34.)

### C. Z.P.'s Alleged Rape of A.P.

Early in the morning of October 1, 2017, after consuming alcohol, A.P. and her roommate S.M. ran into Z.P. in the common area of their dormitory. A.P. and S.M. invited Z.P. up to their room to watch Netflix. At some point early in the morning, A.P., who had been drifting in and out of consciousness, came into consciousness while Z.P. was engaged in non-consensual penetration. (Doc. #133, p. 24.) Sometime after Z.P. left early in the morning, A.P.

---

[5] Z.P. also informed Dr. Pratt during his own interview that there were "not too many girls to pick from" on campus. (Doc. #133-4, p. 39.)

5

went to her parents' home nearby and then to a local hospital to have an examination performed. The morning of the following day (Monday, October 2, 2017), A.P. emailed two professors and told them she had been sexually assaulted. Both faculty members forwarded the emails to Dr. Pratt.

On October 3, 2017, WJC's Deputy Title IX Coordinator, Missy Henry, ("Ms. Henry") emailed A.P. providing a link to WJC's Anti-Harassment Policy and requesting a meeting. The morning of October 4, 2017, Ms. Henry met with A.P. and S.M. and obtained their statements concerning A.P.'s alleged rape. Ms. Henry then drove A.P. to the local police department to make a report. In the afternoon of October 4, 2017, Dr. Pratt issued an interim suspension banning Z.P. from campus and prohibiting him from participating in any college-sponsored events or activities. On October 6, 2017, Dr. Pratt issued his investigation report for the earlier video-recording incident, completing Phase I of WJC's response to a complaint, and recommended a finding that Z.P. engaged in sexual harassment in violation of the Anti-Harassment Policy. On October 13, 2017, Dr. Pratt issued the investigation report on the alleged rape of A.P. that also recommended a finding that Z.P. violated the Anti-Harassment Policy.

Phase II of WJC's complaint resolution process requires an independent party, such as WJC's Provost, review the Title IX Coordinator's report and make a final determination. On October 17, 2017, the Provost issued her determination regarding the video-recording incident, finding that Z.P. violated WJC's Anti-Harassment Policy. The Provost imposed a one-year suspension and required Z.P. complete training before his return to campus. On November 14, 2017, the Provost issued her determination regarding the alleged rape of A.P., again finding that Z.P. violated the Anti-Harassment Policy, and permanently dismissed Z.P. from campus. A.P. ultimately withdrew from WJC during the spring of 2018.

6

## III.    DISCUSSION

A.P. filed this lawsuit against WJC on May 3, 2019.  Her amended complaint asserts the following claims: Count I: Violation of Title IX 20 U.S.C § 1681(a) (Pre-assault); Count II: Violation of Title IX 20 U.S.C § 1681(a) (Post-assault); Count III: Attorney Fees; Count IV: Negligent Failure to Protect; Count V: Premises Liability; Count VI: Negligent Supervision; Count VII: Negligent Infliction of Emotional Distress; and Count VIII: Punitive Damages.  (Doc. #35.)  WJC moves for summary judgment on all of A.P.'s claims.  A.P. concedes to the dismissal of Count II but opposes dismissal of her remaining Counts.  For the reasons discussed below, the Court grants WJC's motion as to A.P.'s Title IX claims, specifically Counts I, II, and III.

### A.   Count I: Violation of Title IX 20 U.S.C § 1681(a) (Pre-assault)

With Title IX, "Congress took action against discrimination on the basis of sex in any educational program that receives federal funding." *Roe v. St. Louis Univ.*, 746 F.3d 874, 881 (8th Cir. 2014).  Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"  20 U.S.C. § 1681(a).  Individuals whose Title IX rights have been violated have a private right of action.  *Cannon v. Univ. of Chicago*, 441 U.S. 677, 709 (1979).  Sexual harassment constitutes discrimination in the school context under Title IX, therefore "student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute."  *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).  However, "[i]f a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference subjects its students to harassment."  *Id.* at 644 (internal quotation marks omitted).

7

To succeed on a Title IX claim based on harassment by another student, a plaintiff must show that the educational institution was "(1) deliberately indifferent (2) to known acts of discrimination (3) which occur[red] under its control." *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017). Known acts, or actual knowledge, requires the funding recipient to have had "prior notice of a substantial risk of peer harassment in the recipient's programs." *Id.* at 1058 (internal quotation marks omitted); *see also Thomas v. Bd. of Trustees of the Neb. State Colls.*, 667 F. App'x 560, 562 (8th Cir. 2016) (finding no genuine issue of material fact existed as to whether the school had actual knowledge that the assailant "posed a substantial risk of sufficiently severe harm to students based on his previous known conduct, or whether the [school] acted with deliberate indifference, both of which are required" to succeed on a Title IX claim). "Additionally, the discrimination must be 'so severe, pervasive, and objectively offensive that it can be said to deprive the victim[ ] of access to the educational opportunities or benefits provided by the school.'" *K.T.*, 865 F.3d at 1057 (quoting *Davis*, 526 U.S. at 650).

WJC argues dismissal of A.P.'s Title IX claims is proper because A.P. fails to produce evidence establishing that: (1) WJC had actual knowledge "that Z.P. posed a substantial risk of sexually assaulting A.P." based on his prior conduct, or that (2) WJC's actions were "clearly unreasonable in light of known circumstances."[6] (Doc. #118, pp. 27, 33) (citing *Davis*, 526 U.S. at 649). A.P. opposes dismissal, arguing the video-recording incident and information revealed during the ensuing investigation are sufficient to show WJC had actual knowledge that Z.P. posed a risk to other students. A.P. further contends she puts forth sufficient evidence showing that WJC was deliberately indifferent to the known risk posed by Z.P. and argues her rape could have been prevented had WJC not acted with deliberate indifference. Upon review of the record,

---

[6] WJC does not dispute that it is a federal funding recipient subject to suit under Title IX, nor does it dispute that the acts Z.P. committed on campus were under its control.

the Court finds A.P. fails to produce evidence sufficient to raise a genuine issue of material fact on the elements of actual knowledge and deliberate indifference.

### 1. Actual Knowledge

In the context of a Title IX claim, "[a]ctual knowledge may be established where the [funding] recipient has prior knowledge of (1) harassment previously committed by the same perpetrator and/or (2) previous reports of sexual harassment occurring on the same premises or actual knowledge that an assailant poses a substantial risk of sufficiently severe harm to students based on the assailant's previous known conduct." *Doe v. Bd. of Trustees of Neb. State Colls.*, No. 17-CV-265, 2020 WL 606426, at *4 (D. Neb. Feb. 7, 2020) (citing *K.T.*, 865 F.3d at 1058). Actual knowledge cannot be demonstrated through a constructive "should have known" standard. *Davis*, 526 U.S. at 642; *see also Thomas v. Bd. of Trustees of the Neb. State Colls.*, No. 12-CV-412, 2015 WL 4546712, at *13 (D. Neb. July 28, 2015), *aff'd*, 667 F. App'x 560 (8th Cir. 2016) (internal quotation marks omitted) ("[T]he standard for liability under Title IX is not satisfied by knowledge that something might be happening and could be uncovered by further investigation. The standard is 'actual knowledge.'"). Generally, courts evaluating whether a plaintiff sufficiently demonstrates actual knowledge consider the evidence in terms of its "severity," i.e. its seriousness and offensiveness, as well as its "credibility," i.e. its veracity and specificity.[7] *See, e.g.*, *Thomas*, 2015 WL 4546712, at *10; *KD, Next Friend of LD v. Douglas Cty. Sch. Dist. No. 001*, No. 8:17CV285, 2019 WL 5684397, at *7 (D. Neb. Nov. 1, 2019) ("The

---

[7] In performing this analysis, the Court does not make credibility determinations about the evidence—a job solely belonging to the jury—but instead considers the specificity of the evidence and whether it is too vague to give rise to actual knowledge. "[N]ot all undisputed facts will justify summary judgment; as Rule 56(a) suggests, only undisputed material facts can do so. The materiality determination rests on the substantive law, and it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *KC v. Mayo*, No. 18-3045-CV-S-BP, 2019 WL 3577702, at *7 (W.D. Mo. Aug. 6, 2019), *aff'd*, 983 F.3d 365 (8th Cir. 2020) (internal citations omitted).

actual knowledge element has a credibility component and a severity component.") (internal quotation marks omitted).

A.P. argues that she adduces evidence of multiple harassing acts previously committed by Z.P. sufficient to establish that WJC had actual knowledge of Z.P.'s prior sexual harassment and the risk of future harm he posed to others. Specifically, A.P. asserts that prior to her alleged rape, WJC knew about: (1) Z.P.'s prior "Misunderstanding with a Teacher" that he reported in his college application; (2) Z.P.'s video-recording incident where he filmed two students engaging in sex without their consent; and (3) information obtained from the ensuing investigation which revealed Z.P. made women on campus feel uncomfortable. WJC contends the prior acts committed by Z.P. differ in both nature and severity from the alleged rape and lack the requisite credibility to give rise to actual knowledge. Taken as a whole, WJC argues that no reasonable jury could find WJC had actual knowledge of the risk Z.P. posed to others based on the evidence proffered by A.P. The issue, then, becomes whether the evidence of Z.P.'s prior acts produced by A.P. is sufficiently credible and severe to support a finding that WJC had actual knowledge.

The issue of credibility relates to the veracity and conclusiveness of the allegations providing the school with knowledge. "[A]ctual notice requires more than a simple report of inappropriate conduct on the part of a [student] but the . . . standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student." *Gordon ex rel. Gordon v. Ottumwa Cmty. Sch. Dist.*, 115 F. Supp. 2d 1077, 1082 (S.D. Iowa 2000) (citation and quotation marks omitted). However, "vague complaints are insufficient" to support a finding of actual knowledge. *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 457 (8th Cir. 2009). *See also KD, Next Friend of LD*, 2019 WL

10

5684397, at *7 ("Under the credibility component, actual knowledge of harassment cannot be established by rumors, familiar behavior, prior investigations, and vague complaints.") (citations omitted). Regarding the issue of severity, "[i]f [a] school has actual knowledge only of prior conduct that is not sufficiently severe to constitute discrimination under Title IX, it will be more difficult to prove that this prior conduct shows actual knowledge of a substantial risk of actual discrimination." *Thomas*, 2015 WL 4546712, at *10; *see also Davis*, 526 U.S. at 650 (noting the acts of discrimination must be "so severe, pervasive, and objectively offensive" that they deprive the victim of access to the education opportunities or benefits provided by the school.). Additionally, because Title IX imposes liability for discrimination "on the basis of sex," if a harasser's prior conduct is not sexual in nature, it is "more difficult for that conduct to provide actual notice." *Thomas*, 2015 WL 4546712, at *10.

### a. Z.P.'s "Misunderstanding with a Teacher" Prior to Admission

WJC argues it did not have any actual knowledge of Z.P.'s misconduct at high school when he was admitted. A.P. states Z.P.'s admission of a "misunderstanding with a teacher" on his college application provided WJC with knowledge that Z.P. was subject to probation, suspension, removal, dismissal or expulsion while in high school. The Court agrees with WJC.

Applying Eighth Circuit precedent, the Court finds Z.P.'s reported "misunderstanding with a teacher" in high school did not give WJC actual knowledge that Z.P. posed a substantial risk of sufficiently severe harm to other students. *See K.C. v. Mayo*, 983 F.3d 365, 369 (8th Cir. 2020) ("That [plaintiff] alleged unsubstantiated facts to suggest the District somehow should have inferred sexual misconduct here is irrelevant."). There is no evidence indicating Z.P.'s misunderstanding was harassment "on the basis of sex." In fact, the factual record lacks any description of the incident and fails to show the severity or objectively offensive nature of that misunderstanding. At best, A.P. presents evidence of a vague complaint of some unknown prior

11

conduct from when Z.P. was in high school.  Such evidence is insufficient to provide actual knowledge as required under Title IX.  The Court does note that it is alarming that WJC did not follow up on the self-reported "misunderstanding" with a teacher.

### b.  Video-Recording Incident

WJC argues Z.P.'s involvement in the video-recording incident, while wrong, did not involve violence or physical contact and therefore did not give WJC notice that Z.P. posed a substantial risk of sexual assault.  A.P. states Z.P.'s act of filming was both severe and offensive, qualifying as discrimination under Title IX, and sufficient to give WJC actual knowledge of the threat Z.P. posed.  A.P. contends this argument is further evidenced by the fact WJC ultimately suspended Z.P. for two semesters due to his conduct.  While the Court agrees with A.P.'s view that the actions were sexually offensive behavior, Z.P.'s conduct regarding the video-recording incident alone does not create a genuine issue of fact that WJC had actual knowledge that Z.P. posed a risk of sexually assaulting A.P.

The video-recording incident, which WJC ultimately classified as a violation of its Anti-Harassment Policies, was non-violent in nature and, most importantly, still under investigation at the time A.P. was allegedly raped.  While filming A.J. and E.W.'s sexual encounter and then distributing the video shows a disturbing lack of judgment regarding appropriate sexual behavior by Z.P., the incident involved no physical contact and was not considered violent.  (Doc. #133, pp. 12–14.)  Using the analytical framework applied by other courts on this issue, the video-recording incident—while under investigation—is not sufficiently severe or credible to provide WJC with actual knowledge about the risks posed by Z.P.

Regarding the issue of severity, *Thomas*, and the Eighth Circuit's affirming opinion, are instructive.  The family of a former student who was allegedly abducted, sexually assaulted, and murdered by a fellow student sued the college under Title IX.  *Thomas*, 2015 WL 4546712, at 1.

12

The Eighth Circuit upheld the district court's finding that the college did not have actual knowledge that the student assailant, Keadle, posed a substantial risk of sexually assaulting and murdering a student based on his previous known conduct—conduct far more extensive than the facts presented here. *See* 667 F. App'x at 561. In *Thomas*, the college had awareness of: an email indicating Keadle had been convicted of a robbery, accused of other robberies, and allegedly forcibly fondled an eighteen-year-old female; a complaint that Keadle made continuous sexually inappropriate comments, waited for a student to finish her work shift, and then asked her for a kiss once alone with her; and a second complaint which alleged continuous comments and a deceptive Facebook communication. *Id.*

Similar to *Thomas*, where knowledge of prior conduct that was not sufficiently severe failed to establish actual knowledge of a substantial risk of actual discrimination, the record here simply does not show that Z.P.'s harassment interfered with A.J.'s or E.W.'s access to education or "involved anything even remotely approaching the same degree of severity" as his alleged rape. *See Thomas*, 2015 WL 4546712, at *13. Given the facts known by WJC during its investigation, the Court is not persuaded that Z.P.'s behavior was so "severe, pervasive, and objectively offensive" that it deprived the victims of their access to educational opportunities as is required under Title IX. *K.T.,* 865 F.3d at 1057.

Furthermore, the video-recording incident could not give WJC actual knowledge of the risk Z.P. posed prior to A.P.'s alleged rape because WJC was actively investigating the video-recording incident on October 1, 2017, the date of A.P.'s assault. WJC did not conclude that Z.P.'s conduct violated the school's Anti-Harassment policies until October 17, 2017, when the Provost issued her determination after reviewing Dr. Pratt's complete investigation report. While it is alarming that an RA knew of the video and sought help from another RA to deal with

Z.P., A.P. provides no case law to suggest the approximately six-day delay in reporting renders the investigation untimely. Once again, Eighth Circuit precedent on this issue is instructive.

In *Shrum ex rel. Kelly v. Kluck*, the school was aware that the police had investigated a sexual assault complaint that a teacher, Kluck, had allegedly inappropriately touched his female students at school. 249 F.3d 773, 775 (8th Cir. 2001). The police found that while Kluck had made inappropriate remarks to students, there was no evidence of physical contact. *Id.* One year later, the school received complaints of inappropriate comments and touching by Kluck from sixteen students. *Id.* Kluck resigned but went on to teach at another school where he molested a child. *Id.* at 776. The Eighth Circuit found the first school "did not have any actual knowledge of the extent of Kluck's misconduct; it was aware of rumors, investigations, and student statements, but did not possess any conclusive proof that Kluck actually molested students while employed at [the first school]." *Id.* at 780, 782. Although this Court does not use *Shrum*'s "conclusive proof" standard to find WJC could not have been on notice prior to the Provost's ultimate decision, the case is instructive for the component of credibility.

Here, when WJC interviewed Z.P. regarding the video-recording incident on September 21, 2017, Z.P. disputed what the video actually depicted, denied circulating the video, and claimed that he deleted the video immediately after an RA told him to. (Doc. #133-6, p. 6; Doc. #133, p. 15.) Although WJC was actively investigating the video-recording incident at the time of A.P.'s alleged rape, WJC's awareness of Z.P.'s suspected conduct does not satisfy the actual knowledge standard that Z.P. posed a substantial risk of raping or sexually assaulting other students on campus. A.P.'s argument on this point is ultimately unpersuasive, and the video-recording incident, while under investigation, does not create a genuine issue of fact that WJC had actual knowledge of the risk posed by Z.P.

### c. Student Interviews

WJC argues the information about Z.P. revealed during the video-recording investigation is insufficient to support a finding of actual knowledge because it consisted largely of vague complaints and hearsay. A.P. disagrees, claiming the information provided from the interviews gave WJC knowledge that Z.P. posed a risk of sufficiently severe harm to other students. The Court finds the interviews, while disturbing, revealed only vague complaints and unsubstantiated facts. Without more, A.P.'s proffered evidence on this point is insufficient to meet the actual knowledge standard. *See Plamp*, 565 F.3d at 457 ("[V]ague complaints" were insufficient to support a finding of actual knowledge of a teacher's discriminatory actions); *Gebser*, 524 U.S. at 291 ("[A] complaint from parents of other students charging only that [the teacher] had made inappropriate comments during class" was "plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student."); *K.C. v. Mayo*, 983 F.3d at 369 ("That [the plaintiff] alleged unsubstantiated facts to suggest the District somehow should have inferred sexual misconduct" was irrelevant.).

### i. C.Y.'s Interview

During his interview on September 19, 2017, C.Y. described Z.P. as a "predator" who "hits on women constantly" and "pushes hard to have sex with women." (Doc. #133, p. 16.) However, C.Y. also admitted to never observing Z.P. engage in sexual violence with anyone and only recalled observing three interactions Z.P. had with women. One of these interactions was not sexual in nature[8] and is thus insufficient to establish that WJC had actual notice under Title IX. *See Gordon*, 115 F. Supp. 2d at 1082 ("The allegation that [the teacher] slapped a seriously

---

[8] C.Y. saw Z.P. and a woman (B.F.) working out at the gym together. C.Y. recalled rumors of Z.P. having sexual relations with B.F. (Doc. #133-3, p. 17.) Not only is the rumor unsubstantiated, there is no claim of non-consensual sex.

impaired student, even if true, gave no notice of the likelihood that he would sexually abuse a student.). The second instance, which the Court discussed previously,[9] is similarly insufficient.

Regarding the third observation, where C.Y. witnessed Z.P. climb on T.R.'s bed and T.R. requested C.Y. stay and convince Z.P. to leave, Dr. Pratt did not document whether he asked C.Y. for additional information about this encounter during their interview. However, during his deposition Dr. Pratt testified that in response to questions regarding who WJC could speak with to further corroborate or investigate C.Y.'s account, "C.Y. refused to answer and sat in silence."[10] (Doc. #133, p. 37.) Not only is this third observation by C.Y. unsubstantiated, it falls short of the standard for actual knowledge.

"[T]he standard for liability under Title IX is not satisfied by knowledge that something might be happening and could be uncovered by further investigation. The standard is actual knowledge." *Thomas*, 2015 WL 4546712, at *13 (citation and internal quotation marks omitted); *see also KC v. Mayo*, No. 18-3045-CV, 2019 WL 3577702, at *13 (W.D. Mo. Aug. 6, 2019), *aff'd*, 983 F.3d 365 (8th Cir. 2020) (noting the school "District's knowledge that [a teacher] wrote inappropriate and unprofessional letters to Plaintiff does not provide the District with knowledge of a substantial risk that [the teacher] would sexually assault Plaintiff."). Here, any knowledge that Z.P. stubbornly attempted to convince T.R. to join him on her bed in a room with other students did not provide WJC actual knowledge of the risk that Z.P. would rape A.P. *See Mayo*, 983 F.3d at 369 ("That K.C. alleged unsubstantiated facts to suggest the District somehow should have inferred sexual misconduct here is irrelevant."); *P.H. v. Sch. Dist. of Kansas City*,

---

[9] See this Court's earlier discussion of E.P., *supra* Section II, footnote 3.

[10] In his deposition, when asked what Z.P. was saying to T.R. during this incident, C.Y. testified, "I couldn't hear, because I kind of sat on the other side of the room watching. I didn't necessarily hear anything." (Doc. #118-4, pp. 12–13.) When asked again if C.Y. could recall anything Z.P. said to T.R., C.Y. responded, "No, No, honestly that will be a question for [T.R.]. I don't know." (Doc. #118-4, pp. 12–13.)

265 F.3d 653, 663 (8th Cir. 2001) (evidence that the school district "should have known" of alleged sexual misconduct was insufficient); *K.T.*, 865 F.3d at 1058 ("the actual knowledge element requires schools to have more than after-the-fact notice of a single instance in which the plaintiff experienced sexual assault."). C.Y.'s characterization of Z.P. as a "predator" is not enough to satisfy the actual knowledge element of A.P.'s claim, although it was relevant to the investigation and turned out to be well founded.

### ii. D.S.'s Interview

During her interview with Dr. Pratt, D.S. stated that Z.P. had asked her out to lunch—which she interpreted to be a date—and she agreed to go, but only as friends because she was offended by Z.P.'s prior comment that "[t]here's not too many girls to pick from" at WJC. (Doc. #133, p. 38.) An interview with student M.D. the day prior revealed that D.S. texted M.D. the night of the video-recording incident asking M.D to hurry and join her in person because she needed help and Z.P. was "bothering [her]." (Doc. #133, p. 38; Doc. #133-12, p. 11.)

A.P. argues WJC should have conducted further inquiry into M.D.'s comment, but neither M.D.'s nor D.S.'s interview revealed any present or even imminent concerns of violence by Z.P.[11] As stated before, "vague complaints are insufficient" to support a finding that a school official or appropriate administrator had actual knowledge of discriminatory actions. *Plamp*, 565 F.3d at 457; *see also, e.g., P.H.*, 265 F.3d at 662–63 (determining complaints that could be construed as "showing favoritism" but that did not "voice[ ] any suspicions of sexual abuse" were insufficient to establish knowledge of such abuse); *Doe v. Flaherty*, 623 F.3d 577, 585 (8th Cir. 2010) (finding text messages with inappropriate comments sent by a coach to female

---

[11] Moreover, in her deposition, D.S. testified unequivocally that Z.P. did not threaten or sexually harass her. Regarding the video-recording incident, D.S. said she had no reason to believe Z.P. posed a threat to others based on the conduct she observed. (Doc. #144-2, pp. 4–5.)

17

students did not provide the school with actual notice of sexual abuse); *Thomas*, 2015 WL 4546712 at *11 (finding the school did not have actual knowledge of the risk that Keadle might abduct and sexually assault a student from two complaints that Keadle had made women uncomfortable). While in hindsight the earlier behavior proved tragically accurate, D.S.'s complaint of Z.P.'s derogatory comment and M.D.'s report that D.S. felt uncomfortable around Z.P. are inadequate to provide WJC with actual knowledge Z.P. posed a sufficient risk of severe harm to students on campus as hindsight is not the legal standard under Title IX. *See Davis*, 526 U.S. at 642 (declining to impose liability under what amounted to a "should have known" negligence standard).

In sum, the evidence proffered by A.P., taken together and while under investigation, is insufficient to support a finding of actual knowledge. Based on the facts that could be presented to a jury and controlling precedent, the Court concludes that WJC is entitled to summary judgment on Count I of A.P.'s amended complaint.

## 2. Deliberate Indifference

Even if WJC had actual knowledge that Z.P. posed a substantial risk of severe harm to A.P., the facts are not sufficient to support a finding that WJC was deliberately indifferent to the knowledge it received. A.P. argues that WJC had more than sufficient information to warrant restricting Z.P. from residing on campus prior to her alleged rape and that a trier of fact could determine its failure to do so was clearly unreasonable. WJC contends it did not respond to the information it had in a deliberately indifferent way; rather, WJC states it initiated and completed an investigation well-inside the U.S. Department of Education's standard.[12]

---

[12] WJC completed its investigation in 25 calendar days and the Provost issued her decision only 11 days later. (Doc. #118, p. 36.) WJC points out that as of September 11, 2017 when the College commenced its investigation, the operative guidance from the U.S. Department of Education specified that a "typical [Title IX] investigation takes approximately 60 calendar days." (Doc. 118, p. 36) (citing Russlynn Ali, *April 4, 2011 Dear Colleague Letter*, UNITED

18

"Once actual notice of discriminatory behavior is shown, the liability of the school [ ] must be predicated on an official decision not to remedy the violation." *Kinman*, 171 F.3d at 610 (referencing *Gebser*, 524 U.S. at 290). Generally, an educational institution is not deliberately indifferent unless it "turn[s] a blind eye and do[es] nothing" upon learning of an act of sexual harassment. *See Kinman*, 171 F.3d at 610. Title IX requires that "the [funding] recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable" in light of the known circumstances. *Davis*, 526 U.S. at 649. This standard "is intended to afford flexibility to school administrators." *Roe*, 746 F.3d at 882. "[F]ailing to follow best practices or past practices is not equivalent to deliberate indifference or clearly unreasonable conduct under Title IX." *Ross v. Univ. of Tulsa*, 180 F. Supp. 3d 951, 969 (N.D. Okla. 2016), *aff'd*, 859 F.3d 1280 (10th Cir. 2017).

A.P.'s proffered evidence, considered as a whole, does not support a finding of deliberate indifference by WJC. When Dr. Pratt was notified of the video-recording incident on September 11, 2017, WJC promptly began an investigation into the matter. Over the next few weeks during Phase I of WJC's response to the incident, Dr. Pratt drafted a report and recommended findings after he and other WJC employees conducted five witness interviews, met with the two victims, and met with Z.P. himself. In accordance with Phase II of the complaint resolution process, Dr. Pratt issued his investigation report for the video-recording incident on October 6, 2017, less than one month after he was first notified of the incident. Roughly two weeks later, WJC's Provost issued her determination that Z.P. violated WJC's Anti-Harassment Policy, imposing a

---

STATES DEPARTMENT OF EDUCATION, 12, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.). "Whether OCR considers complaint resolutions to be timely, however, will vary depending on the complexity of the investigation and the severity and extent of the harassment." *Id.* While WJC's cited guidance provides a point of comparison, the Court does not find this cited authority to be controlling or dispositive on this issue, and further notes the guidance, while perhaps operative at the time of the incident in this case, has since been formally rescinded.

one-year suspension and requiring Z.P. to complete training before he could return. Rather than turn a blind eye to the video-recording incident, WJC officials responded, initiated an investigation,[13] and disciplined Z.P.—actions that were not clearly unreasonable in light of the known circumstances. *See Davis*, 526 U.S. at 649.

While A.P. takes issue with certain aspects of WJC's response, the complaint resolution process and WJC's decision not to temporarily suspend Z.P. from campus during its investigation into the video-recording incident does not amount to deliberate indifference. *See Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019), *cert. denied*, 139 S. Ct. 2763 (2019) (noting that "dissatisfaction with the school's response does not mean the school's response can be characterized as deliberate indifference"); *Waters v. Metro. State Univ.*, 91 F. Supp. 2d 1287, 1293 (D. Minn. 2000), *aff'd*, 52 F. App'x 1 (8th Cir. 2002) ("[W]hile the Court may wish that the University's investigation procedures were a little more thorough, the Court finds that the evidence simply does not support a finding of deliberate indifference on the part of the University.").

A.P. warns that a finding of no actual knowledge or deliberate indifference by WJC in this case will be construed as permitting an alleged assailant to remain on campus while a Title IX investigation is pending. A.P. cautions that schools will, in turn, be incentivized to delay their investigations and findings to minimize the risk of litigation. This Court does not, by its decision in this case, suggest that twenty-five days for an analogous investigation is always appropriate and notes some concerning deficiencies including the RA failing to timely report the

---

[13] During its investigation in response to the incident, WJC interviewed students and asked for clarification or more information when presented with rumors of Z.P.'s other questionable behavior. For example, on October 5, 2017, a Deputy Title IX Coordinator met with E.P. to determine if she had been hurt by Z.P. (Doc. #133, p. 27.) This apparently occurred in response to A.P. disclosing to the Coordinator that there were rumors Z.P. was "involved in another incident" with E.P. (Doc. #133, p. 26.) The record is unclear if this could also have been in response to C.Y.'s recollection of rumors about Z.P. and E.P. having sex. (Doc. #133-3, p. 161:21–25.)

20

video-recording incident.  Whether a given investigation is timely is a fact-intensive inquiry depending on the complexity and severity of the claims.  The Court's determination that the evidence here does not support a finding of deliberate indifference is limited to the facts of this case.  Although A.P. disagrees with the way WJC handled the investigation and its decision not to suspend Z.P. while the investigation was pending, the student's competing right to due process must be balanced.

For example, in *Maher* the plaintiff argued that Iowa State University ("ISU") was deliberately indifferent when it refused to relocate her alleged rapist and offered no comparable housing.  *See Maher*, 915 F.3d at 1213.  The Eighth Circuit disagreed, finding that ISU had offered the plaintiff at least two reasonable housing alternatives which she had declined.  *See id.* "[W]hile Maher's preference was that ISU move [the male student], it was not deliberately indifferent for ISU to wait to take such action until the hearing process concluded because ISU was respecting [the student]'s procedural due process rights."  *Id.*  While a claimant may believe the circumstances surrounding an incident of sexual harassment demand a certain response, a college must balance those wishes against due process concerns in determining the appropriate course of action to take.  *See, e.g., Davis*, 526 U.S. at 648, 649 (stating victims of peer harassment do not have a Title IX right "to make particular remedial demands" and "it would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims"); *Kinman*, 171 F.3d at 610 (finding no deliberate indifference where once the school was alerted to the possibility of an inappropriate sexual relationship, it investigated those allegations and initiated termination proceedings *once it obtained conclusive proof* of the relationship) (emphasis added).

Case 4:19-cv-00351-SRB   Document 150   Filed 02/04/21   Page 21 of 24

In conclusion, the facts in this case, viewed in a light favorable to A.P., would not permit a jury to find that WJC had actual knowledge that Z.P. posed a substantial risk of harm to A.P., or that WJC acted with deliberate indifference. While the alleged rape is tragic, and Missouri negligence law would require a different standard, Title IX does not impose liability based on hindsight or what WJC should have known. Accordingly, WJC is entitled to summary judgment on A.P.'s Title IX claim in Count I of her amended complaint.

### B. Count II: Violation of Title IX 20 U.S.C § 1681(a) (Post-assault)

WJC additionally moves for dismissal of Count II, stating the uncontroverted facts show that WJC was not deliberately indifferent to A.P.'s report that Z.P. raped her. In her response, A.P. consents to the dismissal of both Count II and her claim for Title IX injunctive relief. Accordingly, WJC's motion for summary judgment on Count II is granted.

### C. Count III: Attorney Fees

In her amended complaint, A.P. asserts a standalone claim for attorney fees pursuant to 42 U.S.C. § 1988(b) for violations of Title IX 20 U.S.C. § 1681(a). WJC seeks dismissal of Count III, stating that the request for attorney fees is not a free-standing cause of action. Given the Court's determination that WJC is entitled to summary judgment on A.P.'s Title IX claims (Counts I & II), dismissal of Count III is appropriate.

### D. Supplemental Jurisdiction Over A.P.'s Remaining State Law Claims: Counts IV–VIII

This Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because this litigation involved matters of federal law—specifically, A.P.'s Title IX claims pursuant to 20 U.S.C. § 1681, *et seq.* Given this Court's determination that WJC is entitled to summary judgment on A.P.'s Title IX claims, the issue arises of whether this Court

22

continues to have supplemental jurisdiction over A.P.'s remaining state law claims.[14]  On

January 19, 2021, this Court ordered both parties to file a brief on whether it should exercise

supplemental jurisdiction over A.P.'s remaining state law claims.  A.P. argues that the Court

should not exercise supplemental jurisdiction; WJC argues that the Court should dismiss the state

negligence claims or not exercise supplemental jurisdiction.  The Court agrees with A.P.

Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental

jurisdiction over a claim if the district court has dismissed all claims over which it has original

jurisdiction.  "A district court's decision whether to exercise [supplemental] jurisdiction after

dismissing every claim over which it had original jurisdiction is purely discretionary."  *Carlsbad*

*Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009).  "[I]n the usual case in which all federal-

law claims are eliminated before trial, the balance of factors to be considered under the pendent

jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward

declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ.*

*v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  "Federal district courts should exercise judicial restraint

and avoid state law issues wherever possible because state law claims are more properly heard

by state courts."  *Quinn v. BJC Health Sys.*, 364 F. Supp. 2d 1046, 1056 (E.D. Mo. 2005)

(citations omitted).

Here, the factors weigh in favor of declining to exercise supplemental jurisdiction.

Judicial economy and convenience do not heavily favor retaining jurisdiction since discovery

produced in this case may be used in a case subsequently filed in state court.  *See*, *e.g.*, *C & J*

*Mgmt. Corp. v. Anderson*, 707 F. Supp. 2d 858, 864 (S.D. Iowa 2009) ("the Court d[id] not

---

[14] Count VIII asserts a claim for punitive damages.  To the extent A.P. seeks punitive damages for WJC's alleged
violations of Title IX, the Court's finding that WJC is entitled to summary judgment on A.P.'s Title IX claims similarly
warrants dismissal of Count VIII.  To the extent A.P. seeks punitive damages for WJC's alleged negligence under
Counts IV-VII, the Court declines to rule on the issue.

23

foresee a significant inconvenience to the parties if Plaintiffs refile[d] their state claims in state court since their work, to date, c[ould] be directly applied in a state court action.").  Regarding fairness, A.P. is a citizen and resident of the state of Missouri and WJC is a private four-year college located in Liberty, Missouri.  "Out of respect for the principles of federalism and for the courts of the State of [Missouri,]" the Court finds that a Missouri state court should resolve this dispute between citizens of Missouri and which involves the application of state law.  *Graham v. Entergy Arkansas, Inc.*, 2011 WL 4963026, at \*5 (E.D. Ark. Oct. 19, 2011).

"When declining to exercise supplemental jurisdiction under § 1367(c), the court can decide to dismiss the remaining claims without prejudice or remand those claims to state court." *Graham v. Hubbs Mach. & Mfg., Inc.*, 188 F. Supp. 3d 895, 907 (E.D. Mo. 2016) (citations omitted).  However, "a district court has no power to remand a non-removed case to state court." *Streambend Properties II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1017 (8th Cir. 2015) (citations omitted).  On balance, the Court finds that while its continued exercise of supplemental jurisdiction would be permissible, it declines to do so here.  The Court thus declines to exercise supplemental jurisdiction over the state law claims (Counts IV-VIII) and dismisses the same without prejudice.

## IV.    CONCLUSION

Accordingly, it is hereby **ORDERED** that WJC's Motion for Summary Judgment (Doc. #118) is **GRANTED**, to the extent that Counts I, II, and III of A.P.'s amended complaint are dismissed with prejudice.  It is **FURTHER ORDERED** that Counts IV-VIII are dismissed without prejudice.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
Dated: <u>February 4, 2021</u>                    UNITED STATES DISTRICT JUDGE